UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DEXSI ROTGER, as Administrator of the Estate of:
Nelson Rotger,                                                        :
                                                                     :
                                            Plaintiff,   :
                                                                     :
                        -v-                              :
                                                                     :
MONTEFIORE MEDICAL CENTER,                               :
                                                                     :
                                            Defendant.   :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03/29/19

1:15-cv-7783-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

Nelson Rotger, an X-ray technologist who previously worked for Defendant Montefiore

Medical Center ("Montefiore" or "Defendant"), brought this suit in October 2015, alleging that

Montefiore discriminated and retaliated against him in violation of Title VII, the Americans with

Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), the New York State

Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"). Mr.

Rotger passed away on October 28, 2015. On April 29, 2016, Rotger's wife, Dexsi Rotger, the

administrator of his estate ("Plaintiff"), amended the complaint to add a claim against Montefiore

for wrongful death, alleging that Montefiore's unlawful discriminatory and retaliatory treatment of

Rotger aggravated his pre-existing seizure disorder and caused his death. Dkt. No. 34. Defendant

moved for summary judgment on all of Plaintiff's claims on March 10, 2017. Dkt. No. 63. Because

Plaintiff has raised a triable issue of fact regarding each of her claims, with the exception of her

claims for retaliation under the ADA and for wrongful death, Defendant's motion is GRANTED

IN PART and DENIED IN PART.

## I.  BACKGROUND

The Court views the facts in the light most favorable to the plaintiff.  *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).  Unless otherwise indicated, the following facts are undisputed.

Nelson Rotger ("Rotger") worked as an X-ray technologist ("tech") with Montefiore from March 12, 2008 until his employment was terminated on September 20, 2013.  Plaintiff's Response to Defendant's Local Rule 56.1 Statement, Dkt. No. 74 ("56.1") ¶¶ 1, 3.  Leonard McLean was also hired on the same date as Rotger and served as the Assistant Chief Technologist of Montefiore's radiology department.  McLean was responsible for supervising techs who worked the evening shift, which included Rotger.  56.1 ¶¶ 1, 7, 9.  Rotger identified as Hispanic.  56.1 ¶ 4.  Plaintiff also claims that Rotger suffered from a seizure disorder, of which McLean was aware.  Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Dkt. No. 73 ("Pl. Mem."), at 4.

Plaintiff alleges—and Montefiore denies—that McLean subjected Rotger and other techs to discriminatory treatment on the basis of race and that McLean further targeted Rotger based on his disability.  *Id.* at 3-4.  Plaintiff claims that McLean regularly made racist comments about Hispanic people and derogatory comments about Rotger's seizure disorder.  *Id.*  Plaintiff also claims that Rotger made complaints to various management and Human Resources personnel regarding McLean's behavior.  *Id.* at 4-7.  Montefiore denies having received several of these complaints and generally alleges that it was unaware that Rotger's complaints related to race or disability discrimination, as opposed to simply run-of-the-mill workplace conflicts with McLean regarding, for instance, McLean's methods of distributing work and the tone he used with employees.  Defendant's Memorandum of Law in Support of its Summary Judgment Motion, Dkt. No. 65 ("Def. Mem."), at 15-16.

The parties agree that Rotger was disciplined on many occasions over the course of his employment with Montefiore, though they disagree regarding whether that discipline was justified. *See* 56.1 ¶¶ 36, 39, 42, 43, 44, 45, 46, 48, 50, 51, 52, 53. While Plaintiff claims that this discipline was "part of Defendant's pattern of discriminating and retaliating against Rotger," *see, e.g.*, 56.1 ¶ 36, Montefiore maintains that its discipline of Rotger was based on non-discriminatory reasons as set forth in the various disciplinary notices and records surrounding the disciplinary actions. Def. Mem. at 3-4.

Montefiore terminated Rotger's employment on September 20, 2013, after McLean reported that on September 17, 2013, the daughter of a patient had told him that Rotger "almost ran into her mother with the portable [X-ray] machine and did not stop to apologize." 56.1 ¶ 68. McLean told his supervisors that while he was talking to the daughter, Rotger "wait[ed] around the bend," and that after McLean walked away he "heard [Rotger] say something in [S]panish to [the daughter] and the daughter replied in an angry tone." McLean also stated to his supervisors that the patient told him that Rotger "mocked" her and said in Spanish "Reporte me, [r]eporte me." *Id.* Montefiore claims that it confirmed McLean's account with the patient's daughter before terminating Rotger for misconduct. Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment, Dkt. No. 89 ("Def. Rep."), at 6. Plaintiff claims that Montefiore fired Rotger based on McLean's account alone and denies that Rotger engaged in the conduct described in McLean's complaint. Pl. Mem. 21-23.

Rotger died on October 28, 2015, more than two years after his termination from Montefiore. 56.1 ¶ 5. Plaintiff claims that Rotger's increased stress as a result of his termination from Montefiore aggravated his pre-existing seizure disorder and caused him to suffer a seizure on October 15, 2015, from which he never regained consciousness. 56.1 ¶ 168. Montefiore claims that Rotger had a "long history of alcohol abuse and head injuries" and that no admissible evidence in

3

the record supports Rotger's allegations that his employment at or termination from Montefiore affected his health or contributed to his death.  Def. Mem. at 26-27.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).  To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed.*

*Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236 (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

In employment discrimination cases, where direct evidence of intentional discrimination is rare, "affidavits and depositions must be carefully scrutinized for circumstantial proof" of discrimination. *Turner v. NYU Hosps. Ctr.*, 784 F. Supp. 2d 266, 275 (S.D.N.Y. 2011) (citing *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994)), *aff'd*, 470 F. App'x 20 (2d Cir. 2012). "However, even in such cases, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment and show more than some metaphysical doubt as to material facts." *Id.* at 275-76 (internal quotations omitted) (citing *Schwapp v. Town of Avon*, 118 F. 3d 106 (2d Cir. 1997); *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)); *Brown v. Johnson & Johnson Consumer Products, Inc.*, 92-cv-7886-KTD, 1994 WL 361444, at *3 n.3 (S.D.N.Y. July 11, 1994) ("To assert that [defendant's] witnesses may be lying, without any evidence to contradict the witnesses' testimony cannot defeat a motion for summary judgment.") (citation omitted).

## III.   DISCUSSION

### A.  Title VI and NYSHRL Claims for Discrimination on the Basis of Race and Color

Plaintiff alleges that Montefiore violated Title VII and the NYSHRL by discriminating against Rotger on the basis of his race and color.  In particular, Plaintiff alleges that this discrimination resulted in three categories of adverse employment actions:  1) McLean treated Rotger differently than black employees by, among other things, giving him less desirable work assignments;[1] 2) McLean unjustifiably disciplined Rotger; and 3) Montefiore ultimately terminated Rotger's employment in September 2013.

Title VII makes it an "unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  "Employment discrimination claims brought under the NYSHRL are analyzed identically to claims under Title VII."  *Cooper v. New York State Dep't of Labor*, 819 F.3d 678, 680 (2d Cir. 2016) (internal alteration and citation omitted).

"The ultimate issue in any employment discrimination case is whether the plaintiff has met his burden of proving that the adverse employment decision was motivated at least in part by an impermissible reason—*i.e.*, that there was discriminatory intent."  *Sharpe v. MCI Commc'ns Servs., Inc.*, 684 F. Supp. 2d 394, 401 (S.D.N.Y. 2010) (quotation marks deleted).  A plaintiff may prove a discrimination claim either through direct evidence of intent to discriminate or by indirectly showing

---

[1] It is unclear from Plaintiff's briefing whether she intended to argue that McLean's alleged discriminatory work assignments and related conduct were in fact actionable adverse employment actions or merely evidence of McLean's discriminatory intent.  In opposing Defendant's argument that unfair work assignments cannot constitute an adverse employment action, Plaintiff does not directly admit that she is not making such a claim, but bases her rebuttal on the "increased scrutiny and discipline" to which Rotger was subjected "because of his race, medical condition, and complaints about the same."  Opp. at 18.  In an abundance of caution and in response to Defendant's arguments, the Court thus considers whether Plaintiff has adduced sufficient evidence to present a claim for employment discrimination based on alleged discriminatory work assignments.

circumstances giving rise to an inference of discrimination. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).

Where, as here, a Plaintiff alleging discrimination under Title VII does not present direct evidence of discriminatory intent, a summary judgment motion is subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (applying *McDonnell Douglas* framework to Title VII summary judgment motion). Under that framework, Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by demonstrating that: (1) he belonged to a protected class; (2) he was qualified for the position; (3) he experienced an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination. *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251-52 (2d Cir. 2014).

"Establishment of a *prima facie* case 'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *Adeniji v. Admin. for Children Servs., NYC*, 43 F. Supp. 2d 407, 419 (S.D.N.Y. 1999), *aff'd sub nom., Adeniji v. Admin. For Children's Servs.*, F.3d 430 (2d Cir. 1999) (quoting *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir. 1997); *Texas Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). If the plaintiff meets that initial burden, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *Abrams*, 764 F.3d at 251. If the employer offers such a reason, the presumption of discrimination raised by the *prima facie* case is rebutted, and the burden returns to the plaintiff to point to evidence from which a reasonable jury could conclude that the employer's stated reasons are merely a pretext for unlawful discrimination. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016).

Montefiore argues that Plaintiff "has not elicited any admissible evidence that either his direct supervisor McLean, or anyone else at Montefiore, made any statements to Rotger about his

race or color, or made derogatory comments, told racial jokes, or used racial epithets about non-black employees that would be evidence of a discriminatorily based decision." Def. Mem. at 8. This argument simply misstates the record. Rotger's co-worker Stassa testified that McLean regularly made racially discriminatory comments regarding Hispanic people. While all of McLean's alleged remarks do not bear repeating here, Stassa testified, among other things, that McLean denigrated Rotger when Rotger attempted to speak Spanish with patients, making comments such as "These spics are taking over the country. They better learn to speak English if they want to work here." Declaration of James W. Halter, Dkt. No. 77 ("Halter Decl."), Ex. 8 (Stassa Deposition), at 30:2-4. Furthermore, Stassa testified that McLean would "often" say things such as "Spanish people are so lazy" and "Spanish people love to f\*\*k, eat and sleep. That's why there's so many of them." *Id.* at 138:25-39:11.[2] These alleged comments evince not simply hostility towards Rotger's race, but also beliefs about how Rotger's race affected his job performance, providing a nexus between the comments and the various adverse employment actions that Rotger allegedly suffered at McLean's direction. *See, e.g., Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Sys.*, 862 F. Supp. 2d 127, 155 (D. Conn. 2012) (discriminatory conduct made in the context of hiring professors had nexus to decision not to recommend a specific professor for tenure). Plaintiff has thus put forth sufficient evidence of McLean's discriminatory animus to establish her burden of demonstrating that the various alleged adverse employment actions in which McLean was involved "took place under circumstances giving rise to an inference of discrimination." *Abrams*, 764 F.3d at 251-52; *see also Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) ("An inference of discrimination can arise from circumstances including . . . the employer's criticism of the plaintiff's performance in

---

[2] Defendant attempts to discredit Stassa's testimony by pointing out that Stassa was terminated one year prior to Rotger's termination. Def. Mem. at 14. That Stassa cannot—and did not—testify regarding the circumstances of Rotger's termination does not render his testimony irrelevant. To the extent that Defendant is asking the Court to find that Stassa's testimony should be discredited, such a determination is inappropriate on summary judgment. *See Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017).

ethnically degrading terms . . . or its invidious comments about others in the employee's protected group . . . ." (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009))).

However, Defendant correctly points out—and Plaintiff effectively concedes—that Plaintiff's discrimination claims regarding any adverse actions other than Rotger's termination are time barred under Title VII. *See Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004) ("A plaintiff may bring a claim under Title VII only for acts of discrimination that occurred within the statutory period set by 42 U.S.C. § 2000e–5(e)(1)."). However, the parties agree that because Plaintiff also pursues his discrimination claims under the NYSHRL, the Court should consider Plaintiff's claims based on any adverse employment actions which occurred after July 14, 2011, or three years before Rotger filed his complaint with the EEOC. *See Schneider v. Wal-Mart Stores, Inc.*, No. 16-CV-2010 (NSR), 2019 WL 294309, at *3 (S.D.N.Y. Jan. 23, 2019) ("Claims arising under the NYHRL, both NYSHRL and NYCHRL, are subject to a three-year statute of limitations. . . . Although the Second Circuit has not yet decided whether the filing of a charge with the EEOC tolls the statute of limitations on NYSHRL claims, numerous courts in this Circuit have determined that filing an EEOC charge does toll those claims.").

### 1. Less Desirable Work Assignments

Plaintiff's first allegation—that McLean treated Rotger differently than black employees by, among other things, giving him less desirable work assignments—cannot as a matter of law state a claim under Title VII and the NYSHRL. The alleged discriminatory treatment Plaintiff describes is not an adverse employment action.

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. . . . An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir.

2006)). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Galabya v. New York City Board of Education*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotations and citation omitted).

As Defendant correctly argues, allegations of "unfair work assignments, without more, do not amount to 'adverse employment actions' because they are not materially adverse changes in the terms or conditions of [the plaintiff's] employment." *Hubbard v. Port Authority of New York and New Jersey*, No. 05 Civ. 4396, 2008 WL 464694, at *11 (S.D.N.Y. Feb. 20, 2008); *see also Ward v. Shaddock*, No. 14-CV-7660 (KMK), 2016 WL 4371752, at *5 (S.D.N.Y. Aug. 11, 2016); *Dasrath v. Stony Brook Univ. Med. Ctr.*, No. 12-CV-1484 SJF SIL, 2015 WL 1223797, at *8–9 (E.D.N.Y. Mar. 17, 2015); *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 406–07 (S.D.N.Y. 2014). Furthermore, the parties do not dispute that the assignments McLean gave Rotger fell within Rotger's job responsibilities. 56.1 ¶ 16; *see also Williams v. New York City Housing Authority.*, No. 03 Civ. 7764, 2008 WL 2695139, at *3 (S.D.N.Y. June 29, 2008), *aff'd*, 361 Fed. App'x. 220 (2d Cir. Jan.19, 2010) ("Where assignments fall within the duties of a plaintiff's position, receiving unfavorable . . . work assignments does not rise to the level of an adverse employment action."). To the extent that Plaintiff attempts to base his NYSHRL claims on the fact that McLean allegedly allowed black employees to take longer breaks and read during work, those claims similarly fail as a matter of law. *See Joseph v. Brooklyn Developmental Disabilities Servs. Office*, No. 12CV4402PKCCLP, 2016 WL 6700831, at *23 (E.D.N.Y. Sept. 30, 2016) ("[T]he denial of breaks . . . does not materially impact the terms and conditions of [plaintiff's] employment comparable to termination, demotion, or decreased wages, and thus more closely resembles a mere inconvenience." (internal quotations omitted)).

### 2. Disciplinary Actions

As noted above, the parties agree that Rotger was disciplined on many occasions over the course of his employment, though they disagree regarding whether that discipline was justified. *See* 56.1 ¶¶ 36, 39, 42, 43, 44, 45, 46, 48, 50, 51, 52, 53. To the extent that Plaintiff seeks to base her employment discrimination claim on those incidents of discipline, only five occurred after July 14, 2011: (1) On November 1, 2011, Beyde counseled Rotger for clocking in early, 56.1 ¶ 50; (2) On November 7, 2012, Rotger received a verbal warning for misidentification and an accompanying disciplinary notice, 56.1 ¶ 51; (3) On February 11, 2013, McLean counseled Rotger for violating the radiation safety policy by returning his badge two months late, 56.1 ¶ 52; (4) On April 29, 2013, Beyde counseled Rotger regarding the "inappropriate action of his wife trying to obtain his personal work information," 56.1 ¶ 53; (5) On August 21, 2013, Rotger was suspended for one day based on incidents which allegedly occurred on August 6, 2013 and August 8, 2013, 56.1 ¶ 67. [3]

Plaintiff argues broadly that the discipline Rotger received from Montefiore over the course of his employment "was part of Defendant's pattern of discriminating and retaliating against Rotger." *E.g.*, 56.1 ¶ 36. Plaintiff further alleges that Montefiore has not offered any non-discriminatory justification for any of its pre-termination adverse actions against Rotger and "has only submitted inadmissible hearsay support for its pre-termination discipline of Rotger." Pl. Mem. at 21.

With regard to the two incidents in which Beyde disciplined Rotger, Plaintiff's arguments are irrelevant because she has failed to make out a *prima facie* case of employment discrimination. There is absolutely no evidence in the record suggesting that Beyde harbored any discriminatory animus

---

[3] Defendant also notes in its 56.1 Statement that on August 2, 2011, McLean emailed Beyde to inform her that Rotger and two other techs left their stations without being relieved by the night crew and that he believed this conduct merited discipline. 56.1 ¶ 49. However, because there is no evidence in the record that this incident resulted in any discipline for Rotger, Plaintiff cannot base a claim for employment discrimination on this incident.

towards Rotger. Nor is there any evidence that any person besides Beyde was involved in the decision to discipline Rotger for these incidents. *See* Halter Decl., Ex. 5 (McLean Deposition), at 206:21-23 ("Q. Do you remember talking to [Rotger] about [clocking in early]? A. No, I think Natasha [Beyde] would have dealt with this matter."); Ex. 4 (Beyde Deposition), at 55:2-7 ("I recall a situation when his wife called me asking me: What am I going to be using for his time off, and I told her, with all due respect, I cannot provide that information to her or anyone else other than Nelson.").

Regarding the remaining three incidents, the documentary evidence in the record is sufficient to establish legitimate, non-discriminatory reasons for the adverse employment actions. Contrary to Plaintiff's assertions, the disciplinary violation notices in the record are not introduced for the hearsay purpose of proving that the underlying conduct occurred as Defendant alleged, but merely to demonstrate Defendant's purported reason for its action. Declaration of Eli Z. Freedberg, Dkt. No. 70 ("Freedberg Decl."), Exs. 30, 31, 44; *see McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case, however, we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what 'motivated the employer.'"). Contrary to Plaintiff's assertions, Defendant is not obligated to show that Rotger did in fact commit the violations for which he was disciplined. Instead, it is Plaintiff's obligation to raise a triable issue of fact regarding whether "the legitimate, non-discriminatory reasons proffered by the defendant were false," and whether it is "more likely than not discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). Here, there is no admissible evidence suggesting that the justifications provided by Montefiore were false or that discrimination was the real reason for the employment action. Indeed, with regard to the November 7, 2012 and February 11, 2013 incidents, Plaintiff does not even deny that the underlying conduct occurred as Montefiore has described. 56.1 ¶¶ 51, 52. Although Plaintiff cites to two documents

purportedly written by Rotger denying the allegations underlying his August 21, 2013 suspension, the statements in both document are inadmissible hearsay.[4]  Because Plaintiff cannot raise a triable issue of fact regarding whether Defendant's decisions to discipline Rotger were pretextual, she cannot base her claims for employment discrimination on these instances of discipline.

### 3. Rotger's Termination

Finally, Plaintiff asserts that Montefiore violated Title VII and the NYSHRL when it terminated Rotger's employment in September 2013.  As a preliminary matter, the parties offer differing characterizations of McLean's role in Plaintiff's termination.  Defendant argues that "Mr. McLean played no part in the decision to terminate Rotger's employment."  Def. Mem. at 5. Plaintiff claims that this statement is belied by Defendant's previous position that "it was . . . McLean's witnessing of the incident that caused the claimant [Rotger] to be terminated."[5]  Pl. Mem. at 23.  This dispute about characterization is irrelevant; the record demonstrates that McLean initially reported the September 17, 2013 incident which formed the basis of Rotger's termination to his supervisors and that the ultimate decision about Rotger's termination was made by either Dennis Villanueva, the Assistant Administrator of the radiology department, or Joseph O'Connell, who worked in Human Relations, or both of them together.  *See, e.g.*, Halter Decl., Exs. 59, 61.

Because there is no evidence that Villanueva or O'Connell harbored any racially discriminatory animus towards Rotger, Plaintiff's case for unlawful termination must proceed under the "cat's paw" theory.  "[T]he 'cat's paw' metaphor now 'refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a

---

[4] The first document appears to be a typed statement purportedly written by Rotger, which was produced by Plaintiff in discovery.  Halter Decl., Ex. 50.  The second is an email sent by Rotger to Beyde on August 9, 2013.  Halter Decl., Ex. 53.

[5] In support of this claim, Plaintiff cites testimony from Rotger's Unemployment Insurance Appeal Board hearing.  As discussed in greater detail below, the Court finds that this testimony is admissible.

motive and intended to bring about the adverse employment action." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016). "Under the cat's paw theory, 'if a supervisor performs an act motivated by . . . animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . .'" *Campbell v. Nat'l Fuel Gas Distribution Corp.*, 252 F. Supp. 3d 205, 214 (W.D.N.Y. 2017), *aff'd*, 723 F. App'x 74 (2d Cir. 2018) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)). Plaintiff has adduced sufficient facts for her claim to survive summary judgment under the cat's paw theory.

Defendant argues that the cat's paw theory does not apply because it insulated its termination decision from McLean's influence. It claims that the three people involved in the investigation—Natasha Beyde, the Chief Technologist and McLean's direct supervisor, Villanueva, and O'Connell—took independent steps to verify the September 17, 2013 incident with the patient's daughter. However, the timeline of events as set forth in the record would allow a reasonable jury to conclude that the decision to terminate Rotger was made based solely on McLean's report of the event, before any corroborating statement was received from the patient's daughter.

The evidence in the record shows that on Friday, September 20, 2013 at 12:36 p.m., Beyde emailed Villanueva, cc'ing McLean, and reported that she had attempted to contact the patient and another purported witness regarding the September 17 incident, but the numbers she had for those individuals were not working. Later that day, at 2:56 p.m., Beyde emailed Villanueva saying: "I spoke with the daughter and she stated that she will come in on Monday to file an official complaint." Freedberg Decl., Ex. 45. Beyde's deposition testimony appears to imply that it was this conversation in which she claims to have heard the patient's daughter's corroborating account of McLean's report. Halter Decl., Ex 4 (Beyde Deposition), at 198:18-23. Just over an hour later, at 4:16 p.m., Beyde emailed Rotger's signed termination notice to O'Connell. Freedberg Decl., Ex. 52.

14

That document indicates that the termination notice had already been presented to Rotger at that time because, on the line designated for the "Associate's Signature," it reads "Associate Refused to sign." *Id.* The brief turnaround time between Beyde's alleged conversation with the patient's daughter and the conveyance of the termination decision to Rotger would allow a reasonable jury to conclude that the decision to terminate Rotger occurred before any corroborating evidence was received, when the only information that Beyde, Villanueva, and O'Connell had in their possession was McLean's complaint. Under such circumstances, a reasonable jury could conclude that McLean's complaint was the proximate cause of Rotger's termination.[6]

Plaintiff has similarly put forth sufficient evidence to raise a triable issue of fact that McLean's act in reporting the incident was motivated by discriminatory animus and intended to cause Rotger's termination. Crucially, Plaintiff has adduced evidence which, if credited, would suggest that McLean's version of events, which he conveyed to Beyde and Villanueva, was false or at least exaggerated. McLean stated in his email that "during [McLean's conversation with the patient's daughter in which the daughter reported Rotger's alleged rude behavior] Nelson was waiting around the bend by the front desk. I heard Nelson say something in spanish to her and the daughter replied in an angry tone, 'now you want to taunt me, now you want to talk to me'? I immediately ran from behind the desk, got between them and instructed Nelson to leave the area. The PT then told me that Nelson mocked her and said in spanish Reporte mi, Reporte mi." Freedberg Decl., Ex. 45. During his unemployment benefits hearing, Rotger claimed that he said nothing to the daughter except "excuse me," and that he was not eavesdropping on the conversation between McLean and

---

[6] The Second Circuit's decision in *Vasquez*, 835 F.3d at 267, suggests that while a finding of negligence on behalf of the person making the termination decision may be necessary when the source of the information is a vengeful *co-worker*, such a finding is not necessary when a *supervisor* holds the discriminatory animus and causes the termination by providing information to the person's responsible for the termination decision. *Id.* at 271-74. However, even if a finding of negligence is necessary under these circumstances, a jury could determine that Villanueva's and O'Connell's decision to rely solely on the McLean's statement when making their termination decision—without conducting any additional investigation—was negligent.

the daughter, as McLean's statement suggests. [7] Halter Decl., Ex. 3, at 155:11-160:11. Furthermore, McLean's retelling of events during the unemployment benefits hearing—which occurred only a few months after Rotger's termination—contradicts his initial account. McLean testified that he saw Rotger approach the patient's daughter and get "about two inches apart" from her face and that he personally heard Rotger say "reporta mi, reporta mi." Halter Decl., Ex. 2, at 25:16-26:24. Because a jury could conclude that McLean's version of events—and thus his reason for reporting Rotger—was false, and because Rotger has put forth a *prima facie* case of discrimination, Rotger has raised a triable issue of fact regarding whether McLean's decision to report Rotger was motivated by discriminatory animus. *See Reeves v. Sanderson Plumbing Prod.*, Inc., 530 U.S. 133, 147 (2000) ("[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's

---

[7] Defendant moved to strike the transcript from Rotger's unemployment benefits hearing, as well as the Administrative Law Judge's decision finding that Rotger had not engaged in misconduct, on the ground that under New York Labor Law § 537(b), those documents cannot "be used in any court in any action or proceeding pending therein unless the commissioner is a party to such action or proceeding." Dkt. Nos. 84, 85. However, in its reply briefing, Defendant effectively concedes Plaintiff's argument that this New York state privilege rule is not applicable when a federal court exercises federal question jurisdiction. *See* Fed. R. Evid. 501 ("The common law — as interpreted by United States courts in the light of reason and experience — governs a claim of privilege . . . ."). Although Defendant argues that this Court should adopt the New York Labor Law privilege as a matter of federal common law, the Court declines to do so. *See United States v. Chiarella*, 588 F.2d 1358, 1372 (2d Cir. 1978), *rev'd on other grounds*, 445 U.S. 222 (1980) ("State-created privileges are not controlling . . . except to the extent they reflect 'the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.' To the extent s 537 does create a privilege under New York law, an issue we need not decide, it is one unknown to the common law."). Although *Chiarella* was a criminal case, its logic on this issue similarly applies to this federal question jurisdiction case. *See also von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) (federal privilege law applies when a federal court exercises supplemental jurisdiction over state law claims). On reply, Defendant alternatively argues that the unemployment benefits hearing testimony should be excluded because it does not meet the requirements of Fed. R. Evid. 804(b)(1)(B) because Defendant did not have the same motive to cross-examine Plaintiff during his unemployment hearing as it would have if he were to testify in this action. To the extent that this argument was raised for the first time on reply, the Court declines to consider it. *See Carr v. Cty. of Sullivan*, No. 16-CV-06850 (NSR), 2018 WL 3733952, at *12 (S.D.N.Y. Aug. 3, 2018) (declining to consider an argument "as it is improper to raise arguments for the first time in . . . reply."). Furthermore, given Defendant's failure to cite any legal authority for its position, the Court is skeptical of Defendant's claim that it did not have sufficient motive to cross-examine Rotger regarding the accuracy of his account of the September 17, 2013 events during an unemployment hearing in which the issue of whether or not Rotger committed misconduct was the *sole* issue in dispute.

proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination."); *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009).

Viewing the record in the light most favorable to Plaintiff, the issue of McLean's intent to cause Rotger's termination is also easily satisfied here. Vasquez, another Montefiore employee, testified that McLean had threatened to get certain techs fired. Halter Decl., Ex. 9 (Vazquez Deposition), at 41:11-19 ("What [McLean] said is if the techs are going for my head, I will go for your heads too. . . . Q. When Mr. McLean said that 'I will go for your heads too,' what did you understand him to mean? A. That means he will go for the jobs, for the techs . . . ."). Furthermore, a jury could find that McLean's decision to report Rotger—in light of his knowledge about Rotger's disciplinary history and recent suspension—could also suggest that he intended his complaint to result in Rotger's termination. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 423 (2011) (finding that a reasonable jury could infer that supervisor intended employee be fired when supervisor informed the personnel officer responsible for terminating employees of employee's alleged infraction, and employee was immediately fired afterwards).

Thus, because Plaintiff raises triable issues of fact regarding whether he was terminated as a result of McLean's discriminatory animus, the Court declines to grant Defendant's motion for summary judgment on Plaintiff's Title VII and NYSHRL claims for discrimination based on race and color. [8]

---

[8] In a single footnote in her opposition briefing, Plaintiff also asserts that "[i]n addition to altering the terms and conditions of [Rotger's] employment, McLean's harassment of Rotger rises to the level of a hostile work environment." Pl. Mem. at 15. This claim was not addressed in Defendant's reply briefing and the Court thus declines to rule on the viability of any hostile work environment claim at this juncture.

### B. ADA and NYSHRL Claims for Discrimination on the Basis of Disability

#### 1. Disparate Treatment Claims

Plaintiff has also established a prima facie case with regard to his claims for disability discrimination. "To satisfy the first step of the *McDonnell Douglas* burden shifting framework and establish a prima facie case of discrimination based on disparate treatment [under the ADA, a plaintiff] must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Fox v. Costco Wholesale Corp.*, No. 17-0936-CV, 2019 WL 1050643, at *3 (2d Cir. Mar. 6, 2019).

Defendant does not dispute that Plaintiff has satisfied the first, second, or third prong of his *prima facie* case. The Court finds that she has also established the fourth. In addition to his testimony regarding McLean's racially discriminatory comments, Stassa also testified that McLean on a number of occasions made comments directed towards Rotger which suggested discriminatory animus on the basis of Rotger's disability. Stassa testified that McLean would "mock [Rotger's seizure disorder] openly," state that he "didn't believe it was a bona fide seizure disorder," and would make comments such as "Nelson now is saying he has a seizure disorder so we have to baby him." Halter Decl., Ex 8 (Stassa Deposition), at 71:19-72:2, 76:2-3. Additionally, Stassa testified that at one point, after Rotger returned from leave, McLean asked Rotger, in a disbelieving and condescending tone, "Did you have another seizure? Are you back to work? Are we going to be able to deal with you? Is it going to be a problem?" *Id.* at 129:22-130:7. As with McLean's racially discriminatory comments, these comments suggest McLean's belief that Rotger's disability affected his job performance.

Thus, for the same reasons discussed above in the context of Plaintiff's claims for race and color discrimination, Plaintiff has raised a triable issue of fact regarding whether his termination was motivated by McLean's[9] discriminatory animus towards Plaintiff's disability.[10] Plaintiff has adduced sufficient evidence for a jury to find that McLean harbored discriminatory animus towards Rotger, that he falsely reported Rotger's alleged infraction to his supervisors with intent to get Rotger terminated, and that his report did in fact cause Rotger's termination.

## 2. Failure to Provide Reasonable Accommodation

Defendant argues that any claim Plaintiff makes based on Defendant's failure to provide reasonable accommodation to Rotger must be dismissed because "there is no evidence in the record that Rotger provided medical documentation for the requested accommodation." Def. Rep. at 8. Defendant's argument misstates the law. Plaintiff is not required, as part of his *prima facie* case for failure to provide reasonable accommodation, to demonstrate that he provided medical documentation supporting his requested accommodation. Indeed, the cases Defendant cites for this proposition demonstrate only that "[a]s a part of the interactive process, the employer is entitled to *request* that the employee provide documentation of his disability and the appropriate accommodations for that disability." *Quadir v. New York State Dep't of Labor*, No. 13-CV-3327 JPO, 2016 WL 3633406, at *4 (S.D.N.Y. June 29, 2016), *aff'd*, 691 F. App'x 674 (2d Cir. 2017) (quoting *Zito v. Donahoe*, 915 F. Supp. 2d 440, 448 (S.D.N.Y. 2012)) (alterations omitted) (emphasis added); *see*

---

[9] Plaintiff also attempts to argue that Villanueva harbored discriminatory animus towards Rotger based on Rotger's disability. That argument is based on two emails in which Villanueva arguably expresses displeasure with FMLA leave generally. As discussed in greater detail below, no reasonable jury could find that those emails evince an animus towards Rotger based on his use of FMLA leave, much less a discriminatory animus based on Rotger's disability.

[10] To the extent that Plaintiff attempts base her disability discrimination claims on any adverse employment actions other than Rotger's termination, those claims fail for the reasons discussed above. In her briefing, Plaintiff suggested that McLean gave Rotger a negative performance review based on his disability leave. In the absence of any evidence that the negative performance review "[gave] rise to material adverse changes in work conditions," it cannot provide an independent basis for a disability discrimination claim. *See Dasrath*, 2015 WL 1223797, at *11.

*also Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 580 (S.D.N.Y. 2008). The Court thus declines to dismiss Plaintiff's claim for denial of a reasonable accommodation on this basis. [11]

### C. New York City Human Rights Law Claims for Race and Disability Discrimination

Section 8-107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the . . . race, . . . color . . . national origin[, or] disability . . . of any person, . . . to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a). A plaintiff may bring claims under the NYCHRL for both discrimination and hostile work environment. *See Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 658 (E.D.N.Y. 2015). "Because claims for hostile work environment and discrimination are governed by the same provision of the NYCHRL, they are analyzed under the same standard." *Bacchus v. N.Y. City Dep't of Educ.*, 137 F. Supp. 3d 214, 246 (E.D.N.Y. 2015).

Unlike Title VII, the NYCHRL "does not require 'a connection between the discriminatory conduct and a materially adverse employment action.'" *Garrigan v. Ruby Tuesday, Inc.*, No. 14-cv-155, 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 114 (2d Cir. 2013)). Indeed, the NYHRL is a "one-way ratchet, by which interpretations of state and federal civil rights statutes can serve only as a floor below which the [NYCHRL] cannot fall." *Mihalik*, 715 F.3d at 109 (quotation marks omitted). The proper inquiry under the NYCHRL is whether the plaintiff "was treated 'less well' because of her [membership in a protected class]." *Pena-Barrero v. City of New York*, No. 14-cv-9550, 2017 WL 1194477, at *15 (S.D.N.Y. Mar. 30, 2017) (quoting *Mihalik*, 715 F.3d at 111) (alterations in original).

The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the

---

[11] Because this is the only ground on which Defendant has moved for summary judgment on these claims, the Court expresses no opinion otherwise regarding the viability of these claims.

extent that such a construction is reasonably possible." *Mihalik*, 715 F.3d at 109 (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78 (2011)). "The Court considers the totality of the circumstances, and while courts may dismiss truly insubstantial cases, even a single comment may be actionable in the proper context." *Bacchus*, 137 F. Supp. 3d at 245. Nonetheless, the NYCHRL "is not a 'general civility code.'" *Mihalik*, 715 F.3d at 110 (citing *Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S. 2d 27, 40-41 (App. Div. 1st Dep't 2009)). "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive. It is not enough that a plaintiff has an overbearing or obnoxious boss. [He] must show that [he] has been treated less well at least in part 'because of [his protected characteristic].'" *Id.* (citing *Williams*, 872 N.Y.S. 2d at 39, 40 n.27).

"To defeat summary judgment on a discrimination or hostile work environment claim, the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason." *Bacchus*, 137 F. Supp. 3d at 246 (quotation marks and quotation omitted). "The employer may then present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination but is only entitled to summary judgment where the record establishes as a matter of law that discrimination played no role in its actions." *Id.* (alterations, quotations, and quotation marks omitted).

Here, Plaintiff has clearly adduced sufficient evidence for her NYCHRL claims to survive summary judgment. Because a reasonable jury could find that Montefiore violated both Title VII and the NYSHRL when it terminated Rotger based on McLean's report of misconduct, it could find a violation under the NYCHRL as well. *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75 (2d Cir. 2015).

Although Plaintiff's claims that Rotger was given less desirable work assignments do not rise to the level of an adverse employment action under federal law, Plaintiff faces no such obstacle under the NYCHRL. Indeed, the mere fact that evidence in the record suggests that McLean made

repeated discriminatory comments towards Rotger is sufficient to allow Plaintiff's NYCHRL claims to survive summary judgment. *See Garrigan v. Ruby Tuesday, Inc.*, No. 14 CIV. 155 LGS, 2014 WL 2134613, at *4 (S.D.N.Y. May 22, 2014) (plaintiff could base NYCHRL claim on fact that Defendant "spread[] rumors about her at work, and . . . did so on account of her gender"). And although Plaintiff cannot base her NYCHRL claim on the two instances of discipline Rotger received from Beyde—as to whom there is absolutely no evidence of discriminatory animus—she can state an NYCHRL claim for the other three instances of discipline which occurred after July 14, 2011 and for which there is evidence that McLean either initiated the discipline or was involved in the decision to discipline Rotger.

While the evidence in the record is not sufficient to show that Defendant's proffered explanations for these incidents of discipline were pretextual, Defendant—by failing entirely to engage with the evidence of McLean's discriminatory intent—has not satisfied its burden on summary judgment of establishing that "discrimination played *no* role in the employment action at issue."[12] *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 532–33 (S.D.N.Y. 2015) (emphasis in original) (finding that defendants had not satisfied their burden under the NYCHRL when person alleged to have made discriminatory comments was the "impetus" for company's decision to place plaintiff on a performance improvement plan, even when there was evidence of plaintiff's performance issues); *see also Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015). The Court thus declines to grant Defendant's motion for summary judgment as to Plaintiff's NYCHRL discrimination claims.

---

[12] Defendant argues that there is no evidence that McLean treated Rotger less well than black employees because "the record indicates that McLean got along well with non-black employees and that he was disliked by employees of all races." Def. Mem. at 24. Such evidence is not sufficient to show that McLean did not treat Rotger less well because of his race. *See, e.g.*, *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) ("Since Title VII's principal focus is on protecting individuals, rather than a protected class as a whole, an employer may not escape liability for discriminating against a given employee on the basis of race simply because it can prove it treated other members of the employee's group favorably."); *see also Vasquez v. New York City Dep't of Educ.*, No. 11 CIV. 3674 (AJN), 2014 WL 12782670, at *11 (S.D.N.Y. Mar. 5, 2014), *aff'd*, 667 F. App'x 326 (2d Cir. 2016).

### D. Retaliation Claims under Title VII, the ADA, the NYSHRL, and the NYCHRL

Plaintiff's claims for retaliation under Title VII, the ADA, and the NYSHRL also proceed under the *McDonnell Douglas* burden-shifting framework. "To make out a prima facie case of retaliation [under Title VII, the ADA, or the NYSHRL], a plaintiff must demonstrate that '(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.'" *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012); *see also Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007).

Defendant's arguments regarding Plaintiff's retaliation claims focus on two complaints Plaintiff allegedly made in August and September 2013. Defendant claims that because there is no evidence that anyone at Montefiore was aware of those complaints—and because Rotger had incurred a lengthy disciplinary history prior to his termination—the Court should grant summary judgment on Plaintiff's retaliation claims. Defendant's argument again ignores the record. While the Court agrees that there is no evidence that anyone at Montefiore was aware of the August and September 2013 complaints,[13] Plaintiff has raised a triable issue of fact regarding her retaliation claims because the evidence in the record could allow a reasonable jury to find that Rotger did in fact make at least one complaint of racial discrimination to Montefiore and that McLean made threats to Rotger and other technicians that they would lose their jobs if they continued making complaints about him. This evidence, if credited, is sufficient to establish a causal connection between Rotger's complaint and his termination.

---

[13] Defendant moved to strike both of these written complaints on the basis that they are unauthenticated hearsay. Dkt. Nos. 82, 83. The Court declines to address Defendant's motion to strike at this juncture because it agrees with Defendant's other argument that, even if the complaints were admissible, they still cannot form the basis of a *prima facie* case because there is no evidence that anyone at Montefiore received the complaints.

As a preliminary matter, the Court notes that only one of Rotger's seven alleged complaints to which Plaintiff points as evidence that Rotger engaged in protected activity makes any reference whatsoever to Rotger's disability or McLean's alleged discrimination on the basis of that disability. Halter Decl., Ex. 54 (August 20, 2013 letter). As noted above, there is no evidence in the record that Montefiore ever received that complaint. Furthermore, the evidence to which Plaintiff cites to support its argument that Montefiore was generally aware that Plaintiff's many complaints against McLean were claims of discrimination says nothing about disability discrimination. Halter Decl., Ex. 10 (Villanueva Deposition), at 159:2-5. Plaintiff therefore has not made out a *prima facie* case that Rotger engaged in protected activity under the ADA and that Montefiore was aware of that activity and her claim for retaliation in violation of the ADA is thus dismissed.

However, Plaintiff has put forth sufficient evidence to state a *prima facie* case for retaliation under Title VII and NYSHRL. The evidence in the record would allow a reasonable jury to conclude that on October 18, 2011, Plaintiff signed a written complaint alleging that McLean engaged in racial discrimination and harassment and that complaint was subsequently delivered to Human Resources.[14] Halter Decl., Ex. 32; *id.* Ex. 8 (Stassa Deposition), at 68:3-10. Plaintiff has also adduced evidence that on more than one occasion, McLean threatened Rotger and other techs, telling them that they would be fired for making complaints about him. *See* Halter Decl., Ex. 8 (Stassa Deposition) at 131:21-132:4 ("Throughout Nelson and my employment. That was one of Mr. McLean's standard quips. 'If you don't like it, report me. Do what you got to do. Write another e-mail like you guys always do. I'm not going anywhere. All you are going to do is end up shooting yourself in the foot and getting fired.' Have you ever heard the expression 'You can't fight City Hall'? That was one of his famous statements."); *see also* Halter Decl., Ex. 9 (Vazquez

---

[14] In his deposition in a discrimination case against Montefiore brought by his co-worker Stassa, Rotger also maintained that on several occasions he made complaints to Human Resources regarding his issues with McLean, which included complaints of racial discrimination. Halter Decl., Ex. 1 (Rotger Deposition), at 43:18-49:13.

Deposition), at 41:11-19. This evidence is sufficient to support a finding that McLean intended to retaliate against Rotger because of Rotger's protected activity. *Stathatos v. Gala Res., LLC*, No. 06 CIV. 13138 RLC, 2010 WL 2024967, at *12 (S.D.N.Y. May 21, 2010) ("[I]n light of [supervisor's] blatant threat to fire [plaintiff] for complaining about putative discrimination, [defendants' alleged non-discriminatory reason for the decision] does not quiet all doubts about whether retaliatory animus influenced defendants' decision."). Because, as discussed above, a jury could also find that McLean's purported justification for reporting Rotger for the September 17, 2013 incident was pretextual, the Court declines to grant Defendant's motion for summary judgment for Plaintiff's Title VII and NYSHRL retaliation claims.

Furthermore, because Plaintiff has put forth sufficient evidence to survive a motion for summary judgment on her Title VII and NYSHRL retaliation claims, the Court also declines to grant Defendant's motion for summary judgment on Plaintiff's NYCHRL retaliation claims. *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75 (2d Cir. 2015).

### E.  FMLA Retaliation Claims

Plaintiff's claim for FMLA retaliation is also analyzed under the *McDonnell Douglas* framework. "In order to make out a prima facie case, [Plaintiff] must establish that: 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). Plaintiff's has failed to meet even the minimal burden of establishing a *prima facie* case of FMLA retaliation.

Rotger was first approved for FMLA leave in September 2012. 56.1 ¶ 113. Plaintiff claims that, after Rotger's first term of intermittent FMLA leave expired the next year, he contacted Montefiore's Central Leave Administration Office on September 18, 2013 to request the forms for

renewing his application.  *See* Declaration of Dexsi Rotger, Dkt. No. 75 ("Dexsi Rotger Decl."), at ¶ 11.  Plaintiff alleges that his termination occurred under circumstances giving rise to an inference of retaliatory intent based on two pieces of evidence: 1) the close temporal proximity between Rotger's request for the forms to renew his FMLA leave and his termination and 2) two comments that Villanueva made in emails regarding FMLA leave generally.  Neither is sufficient to state a *prima facie* case.

First, there is no evidence in the record that any person involved in Rotger's termination— McLean, Beyde, Villanueva, or O'Connell—was aware that Rotger had requested the forms to renew his FMLA leave.[15]  Rotger's wife's declaration states:  "On September 18, 2013, Rotger inquired with Montefiore's Central Leave Administration Office to renew his FMLA leave.  Later that day, Victoria Reissis[,] a Leave and Disability Specialist, emailed Rotger forms to complete and return.  I know this because Rotger told me at the time and because Reissis sent the forms to Rotger via an email account that I shared with him."  Dexsi Rotger Decl. at ¶ 11.  Other evidence in the record confirms that Ms. Reissis was the person who emailed the FMLA forms to Rotger.  Halter Decl., Ex. 58.  Beyde and O'Connell each testified that they were generally not involved in the process of approving FMLA leave, and McLean and Villanueva both specifically testified that they were not aware that Rotger had or intended to apply for another year of FMLA leave.  Halter Decl., Ex. 4 (Beyde Deposition), at 51:17-21; Ex. 6 (O'Connell Deposition), at 54:22-55:4; Ex. 5 (McLean Deposition), at 211:15-18; Ex. 10 (Villanueva Deposition), at 102:4-6.  Plaintiff cannot show an

---

[15] Rotger's wife's declaration contains the following statement: "On September 17, 2013, following Rotger's seizures, Natasha Beyde, the Assistant Director at Montefiore, advised him that he had run out of FMLA leave.  I know this because Rotger told me at the time."  Dexsi Rotger Decl. at ¶ 10.  Defendant has moved to strike this paragraph of the declaration as hearsay.  Although the Court agrees that this statement, on its face, appears to be hearsay, other admissible evidence in the record suggests that Beyde did in fact inform Rotger around this time that his FMLA leave had expired.  Halter Decl., Ex. 56.  Regardless, this evidence does not affect the Court's analysis because the fact that Beyde may have been aware that Rotger's FMLA leave had recently *expired* does not provide any reason to ascribe a retaliatory animus to her based on Rotger's request to *renew* his FMLA leave, in the absence of evidence that she was aware that he intended to renew his request for leave.

inference of retaliatory intent when there is no evidence that the people involved in the termination decision were even aware of the protected activity against which they allegedly retaliated.

Secondly, Plaintiff points to two emails sent by Villanueva in January 2011 and March 2013 as evidence of Villanueva's intent to retaliate against Rotger for taking FMLA leave. Halter Decl., Exs. 19, 46. On January 3, 2011, Beyde emailed Mathew Vithayathil: "I have an associate that will be going out on disability 1/25/2011 for a surgical procedure. Currently he has 201.87 hours of vacation time, his date of hire is 3/3/2008. Is there any way we can avoid him losing his vacation time?" Later in the same email chain, Villanueva responded to Beyde: "Natasha, Nelson should not be saving anything above the two weeks (75). It's nice that you were able to help him but now when he comes back from his LOA we will have to give him that time off. Please tell him not to warehouse his time." Halter Decl., Ex. 19. Plaintiff contends this email shows that Villanueva intended to punish Rotger for using his FMLA leave. But the email says nothing of the sort: Villanueva's comment is not directed at Rotger's use of FMLA, but of his accrual of excess vacation time. No reasonable jury could interpret such an email as evidence of Villanueva's retaliatory intent. *See, e.g.*, *Bond v. Sterling, Inc.*, 77 F. Supp. 2d 300 (N.D.N.Y. 1999) (manager's statement that "we are not a family oriented company, we are a business," was insufficient to infer intent to retaliate against employee for taking FMLA leave).

In the second email chain, Linda Rucker emails Todd Miller on March 26, 2013: "Hi Dr. Miller, It was reported that OR delay, due to no x-ray tech available today. Would you follow up." Dr. Miller forwards that message to Villanueva, who responds on the same day: "Three techs called out sick. Two FMLA. Until something can be done about FMLA it will be a challenge to manage staff." Halter Decl., Ex. 46. Similarly, no reasonable jury could infer that merely because Villanueva expressed a concern that FMLA leave made it difficult to manage staff, that he then—six months later—decided to terminate Rotger's employment because Rotger had previously taken FMLA leave.

*See Bond*, 77 F. Supp. 2d at 300. The Court thus holds that the evidence in the record is not sufficient to allow a reasonable jury to find that Plaintiff has established the *prima facie* elements of her FMLA retaliation claim. Defendant's motion for summary judgment on that claim is granted.

### F. Wrongful Death Claim

Finally, Plaintiff asserts a wrongful death claim against Montefiore, arguing that Montefiore's discriminatory and retaliatory conduct was the actual and proximate of Rotger's death on October 28, 2015. Defendant moves for summary judgment on the ground that Plaintiff cannot show that its actions, even if wrongful, caused Rotger's death or were a reasonably foreseeable result of the Plaintiff's negligence. The Court agrees with Defendant.

To prove a wrongful death claim under New York law, Plaintiff must establish, among other things, that Defendant committed "a wrongful act, neglect or default of the defendant by which the decedent's death was caused." *In re Sept. 11 Litig.*, 811 F. Supp. 2d 883, 886 (S.D.N.Y. 2011). Plaintiff has not adduced sufficient evidence for a reasonable jury to find that Defendant's actions caused Rotger's death. The only evidence on which Plaintiff relies to prove this element of her claim is her own declaration and the declaration of Dr. Gary Rogg. Dkt. Nos. 75, 76. As a preliminary matter, Dr. Rogg's declaration does not even purport to connect Defendant's *wrongful* conduct to Rotger's death. He states only that: (1) "Mr. Rotger experienced elevated stress arising *from his employment* with Montefiore Medical Center. Indeed, Mr. Rotger repeatedly complained to me of work stress at Montefiore Medical Center;" (2) "Mr. Rotger's elevated stress resulted in increased frequency and intensity of his seizures;" and (3) "Mr. Rotger's death was premature and was related to complications from suffering a seizure." Declaration of Gary Rogg, M.D., Dkt. No. 76 at ¶¶ 10, 12, 15 (emphasis added). And even if Dr. Rogg's statement did directly connect Rotger's death to Montefiore's wrongful act, it would still not be sufficient to raise a triable issue of fact. *See, e.g.*, *In re Lind*, 78 A.D.3d 555 (N.Y. App. Div. 1st Dep't 2010) (conclusory assertions of

plaintiffs' medical expert failed to raise genuine issue of material fact which would preclude summary judgment in wrongful death action); *see also Lowe v. Japal*, No. 2016-01094, 2019 WL 1051529, at *2 (N.Y. App. Div. 2d Dep't Mar. 6, 2019) ("The expert affidavit proffered by the plaintiff was speculative and conclusory, and thus did not raise a triable issue of fact [regarding the proximate cause of decedent's death]."); *Pigut v. Leary*, 64 A.D.3d 1182 (N.Y. App. Div. 4th Dep't 2009) (same); *Warme v. City of New York*, 13 A.D.3d 74 (N.Y. App. Div. 1st Dep't 2004) (same). Plaintiff's own declaration—which simply concludes that "Rotger's death was caused, at least in part, by Montefiore's discrimination and retaliation"—suffers from a similar deficiency. Dexsi Rotger Decl., at ¶ 20. Defendant correctly points out that even if Mrs. Rotger were an expert, her *ipse dixit* statement would be insufficient to defeat summary judgment; it thus follows that the *ipse dixit* of a non-expert cannot save this cause of action. *See, e.g.*, *Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 417 (S.D.N.Y. 2012) ("'Entirely conclusory' expert reports are not sufficient to ward off summary judgment."). Montefiore's motion for summary judgment regarding Plaintiff's wrongful death claim is therefore granted.[16]

## IV.    CONCLUSION

For the reasons state above, Defendant's motion for summary judgment is GRANTED as to Counts IV, V, and X and DENIED as to Plaintiff's remaining claims. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 63.

SO ORDERED.

Dated:  March 29, 2019
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

[16] The Court also notes that, as a matter of law, it is skeptical that Montefiore's wrongful acts could be found to be the proximate cause of Rotger's death. *See, e.g.*, *Reinard v. Harsco Corp.*, No. 05-CV-738S, 2006 WL 2795639, at *5-6 (W.D.N.Y. Sept. 26, 2006) ("[A]n employer, even one which allegedly discriminates against its employee, cannot be held liable for catastrophic consequences that are not 'reasonably foreseeable.'"). However, the Court need not reach this issue because Plaintiff's evidentiary support for Plaintiff's claim is clearly insufficient to survive summary judgment.